Filed 11/20/15  P. v. Batton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072081 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F00430) |
| v. | |
| MARIO BATTON, | |
| Defendant and Appellant. | |

Defendant Mario Batton appeals following conviction for first degree residential burglary and resisting a police officer (Pen. Code, §§ 459, 148, subd. (a)(1); unless otherwise set forth, statutory references that follow are to the Penal Code), with prior burglary convictions in 2001 and 1984 serving as two prior serious felonies (§ 667, subd. (a)) and a prior conviction under the three-strike sentencing law (§§ 667, subds. (b)-(i), 1170.12).  Defendant contends the trial court abused its discretion by overruling his objection to the scope of his cross-examination by the prosecution, by allowing collateral

rebuttal testimony, and by allowing the jury to hear evidence of the two prior burglary convictions admitted to impeach defendant and to prove intent and absence of mistake. Defendant also claims the prosecution committed prejudicial misconduct by questions and argument going to propensity and bad character. We affirm the judgment.

FACTS AND PROCEEDINGS

This was defendant's second trial on these charges. The first jury found him guilty, but the court granted a new trial based on a juror's misconduct in failing to disclose information during voir dire.

On January 15, 2010, around 10:45 a.m., sheriff's deputies responded to a report of a possible burglary in progress at a duplex. A deputy stationed in front of the house saw someone inside look out through the window blind and then heard a loud noise inside the house. The deputy stationed in back of the house heard the loud noise and saw two males, later identified as defendant and Demetrius Wilkerson, run out of the back of the duplex into the backyard and over a fence. They ignored law enforcement orders to stop, and deputies took chase. Deputies quickly caught Wilkerson in a neighboring yard a few doors away. A few minutes later, a police dog located defendant hiding in a backyard.

In defendant's pocket, deputies found a woman's watch plus gold and silver watch faces. Wilkerson had a Cannon digital camera and a small Sony PSP Play Station. The victim identified these items as her property. The victim's home had been ransacked -- drawers, cabinets, and closets emptied; items strewn about; and the television had been pulled off the wall. No useable fingerprints were found.

The victim did not know defendant but had dated Wilkerson's brother a couple of years earlier. Wilkerson subsequently entered a plea to an unspecified charge.

Defendant testified at trial. On the day in question, he was living with Shannon Brown, who was his fiancée at the time, and her son at the home of Brown's godmother.

2

Defendant had recently moved from Orange County and had been introduced to Wilkerson through Brown. Defendant was 48 years old, and Wilkerson was around 18 or 19. Defendant said he and Wilkerson were just acquaintances, not friends.

Around 7:00 a.m. on the day of the burglary, Wilkerson came to defendant's home and said he (Wilkerson) and his girlfriend had split up. Defendant asked Wilkerson to come back later. Wilkerson later returned, related his girlfriend problem to defendant and Brown, and asked Brown if it would be alright if defendant helped retrieve Wilkerson's property from the girlfriend's house.

Defendant and Wilkerson walked to the duplex a few blocks away. Wilkerson appeared to try to open the door with a key, said, "My bitch locked me out," and entered the gated yard. Defendant stayed out front for several minutes, then got impatient and went into the backyard. Wilkerson opened the sliding glass door and handed defendant the watch and watch faces. Defendant put them in his pocket and said to hurry because he had other things to do. Wilkerson went back inside. Defendant stayed outside.

After a few minutes, defendant heard a crashing sound, which he thought was Wilkerson running through the house. Defendant heard a screeching sound and saw police cars. Wilkerson ran out the back door, at which point defendant "figured" Wilkerson had done something wrong and "had got me caught up in some stuff." Defendant heard the deputies announce the police dog. He had previously been bitten by a dog. He waited for the deputies to find him.

Defendant admitted he committed, pleaded guilty, and was convicted of residential burglary in 1984 and 1999 and second-degree burglary in 2004. The jury also heard the parties' stipulation that defendant was convicted of residential burglary in 1984 and 1999. (The record indicates defendant was granted probation in 1999 but violated probation and was committed to prison in 2001.)

On cross-examination, defendant said he had not called or talked with Brown in months and did not know her new phone number. Brown was on the witness list as a defense witness but ultimately did not testify at trial.

In rebuttal, the prosecution adduced evidence of Brown's phone number and that defendant phoned it from jail about 25 or 30 times in the two weeks before the trial, once as recently as the day defendant testified.

In his initial closing argument to the jury, the prosecutor did not mention the absence of Brown from the witness stand. The prosecutor highlighted defendant's lies on the witness stand about not knowing Brown's phone number and not having contact with her. The prosecutor argued defendant committed a new crime -- perjury -- and the jury should disbelieve his entire testimony.

Defense counsel argued to the jury that there was no evidence of the length of the calls or whether they were accepted. Defense counsel acknowledged Brown would have been a logical and natural witness, but the defense did not have the burden, and the jurors could not speculate as to why witnesses are called or not called.

In rebuttal argument, the prosecutor said the jurors could consider Brown's absence. The trial court overruled a defense objection. The prosecutor continued, "Ms. Brown is not here. She did not testify. And so her -- you know, the defendant talking about Ms. Brown heard this, Ms. Brown heard that. [Defense counsel], in his opening statement, talking about Ms. Brown's going to tell you this and that. It never happened." The trial court overruled a defense objection of burden-shifting.

The jury found defendant guilty of the residential burglary and resisting a peace officer.

Although the pleading alleged the 1984 and 2001 prior convictions as two strike-priors (§§ 667, subds. (b)-(i), 1170.12) and two qualifying serious felonies (§ 667, subd. (a)), the prosecutor dropped the strike allegation for the 1984 conviction. The trial court found defendant was convicted of first degree burglary in 1984 and 2001.

4

The trial court sentenced defendant to 18 years in prison: The four-year middle term for burglary, doubled for the strike prior, plus five years for each of the two qualifying priors (§ 667, subd. (a)). On count two, resisting a peace officer, the trial court sentenced defendant to 90 days in jail, time served.

DISCUSSION

I

*Defendant's Contacts With Brown*

Defendant complains the trial court improperly allowed the prosecution to cross-examine him about post-arrest communications with Brown and to present collateral rebuttal evidence about such contacts, which defendant views as beyond the scope of his direct examination. Defendant argues the trial court abused its discretion and violated his Fifth Amendment right to remain silent and his Fourteenth Amendment right to due process of law and a fair trial.

According to defendant, Brown was a witness to Wilkerson asking for help to retrieve his property from his girlfriend's house.

Brown did not testify at the first trial but was present as a spectator. After the verdict, she claimed a juror had passed her a note, but the judge in the first trial did not believe Brown.

For the second trial, Brown was on the defense witness list, and defense counsel told the jury in opening statement: "[Defendant's] fiancée is Shannon Brown. You're likely going to hear from Shannon Brown Thursday morning."

Defendant began his testimony by saying that on the day of the burglary (two and a half years before this testimony), he was living with Brown, "which she was my fiancée at the time." Defendant claimed Brown witnessed Wilkerson ask for help to retrieve his belongings from his girlfriend's house. The trial court had ruled Brown could testify to the conversation. The trial court had also expressed concern about the prosecutor's desire

5

to impeach Brown with the first judge's finding that Brown lacked credibility in claiming juror misconduct in the first trial. The court would allow some questions but was concerned that this jury not learn the first jury found defendant guilty.

On cross-examination, defendant acknowledged, "I referred to her as my ex-fiancée, yes." They had known each other and been engaged for only a few months when the burglary occurred. The prosecutor asked what changed the relationship after defendant's arrest. The defense objected the question exceeded the scope of direct examination, which had ended with defendant's arrest. The court allowed the question as going to defendant's credibility, and hers if she testified, and if she did not testify, "we might be able to revisit this." Defendant testified, "me and Shannon are not together anymore." Over defense objection, the court allowed the prosecution to ask whether defendant was still in contact with Brown. Defendant said that, other than receiving an occasional e-mail from her asking how he was doing, "only because she was coming to court," he was not in contact with her. She had moved out of her godmother's house, and defendant did not have her current telephone number and had not talked to her for months. He acknowledged she e-mailed him a couple of months earlier that she loved him. The court allowed this as going to potential bias. Defendant admitted he called Brown in late June 2012 about her coming to court to testify (trial started the end of July 2012), but said he did not tell her "exactly what to come and testify about."

The defense moved for a mistrial or, in the alternative, to strike defendant's testimony about his relationship with Brown and admonish the jury to disregard it. The defense argued the prosecution exceeded the scope of direct examination and improperly used defendant to impeach Brown before she took the witness stand. The defense viewed this as a Fifth and Fourteenth Amendment violation in that the prosecution could not call defendant as a rebuttal witness. The prosecutor countered his questions were within the scope of direct examination because defendant had discussed his relationship with Brown on direct examination, and the questions related to defendant's statements in recorded

6

jailhouse phone calls with Brown that the prosecutor intended to introduce through Brown or a district attorney's investigator.

The trial court denied the mistrial motion, concluding defendant's relationship with Brown was part of his direct testimony, and it was therefore within the scope to ask about the current status of the relationship. The court added, "in a sense [the prosecutor] was anticipating what Ms. Brown might testify to by using the defendant as an impeachment witness, so to speak. We don't really know if that's the case for sure. But it is something that I will anticipate Ms. Brown will testify to." Even though the prosecutor could not call defendant as a rebuttal witness, there were other ways the evidence could have been adduced. The court said there may be an issue with having the jury hear "imprecise recollection[s]" by defendant, going to his credibility, but the trial thus far was not so affected by unfairness as to warrant a mistrial or strike the testimony. The court added there was no federal or state constitutional violation.

The next day, the defense stated it made a tactical decision not to call Brown as a witness, in light of the contents of the recently-transcribed jailhouse calls between her and defendant. The defense renewed its motion for mistrial. The court noted it had denied the motion in part on the assumption Brown would testify and invited comment from the prosecutor. The prosecutor said defendant's testimony on direct examination, that Brown *used to be* his fiancée, conflicted with the recent jailhouse conversations between defendant and Brown, which the prosecutor had recently received but which had not yet been transcribed when defendant testified. The primary purpose of the questioning, said the prosecutor, was to attack defendant's credibility.

The trial court again denied the defense motion for mistrial. Questions about defendant's ongoing relationship with Brown was "fair game" within the scope of direct examination, and it was fair game because Brown was supposed to testify. The court said there was no "scope violation," but even if there were, the trial had not been so infused by unfairness as to violate defendant's right to a fair trial. The court declined to strike the

7

testimony but stated it would not allow the prosecutor to adduce evidence of the most recent jail call which, now that Brown would not be testifying, was an ancillary collateral matter.

Over defense objection, the trial court also ruled the prosecutor could argue to the jury that the defense has failed to produce Brown as a logical witness.

Over defense objection, the trial court allowed the prosecution to present brief rebuttal testimony from the district attorney's investigator, who testified to Brown's telephone number and jailhouse phone logs showing defendant called that number from jail about 25 or 30 times in the last two weeks. The court did not allow the prosecutor to play the recordings.

We review for abuse of discretion the trial court's evidentiary rulings on the scope of cross-examination (*People v. Farnam* (2002) 28 Cal.4th 107, 187) and the admissibility of rebuttal evidence (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1232). The existence or nonexistence of any fact testified to by a witness is always relevant. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9 (*Rodriguez*).) The trial court has discretion to exclude impeachment evidence if it is "collateral," i.e., when the examiner elicits "otherwise irrelevant testimony on cross-examination merely for the purpose of contradicting it." (*People v. Mayfield* (1997) 14 Cal.4th 668, 748, overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, fn. 2.) A collateral matter is one that has no relevance to prove or disprove any issue in the case. (*Rodriguez, supra*, 20 Cal.4th at p. 9; see Evid. Code, § 780, subd. (i) [in determining credibility, jury may consider any matter that has any tendency in reason to prove or disprove the truthfulness of "[t]he existence or nonexistence of any fact testified to by him"].)

Defendant cites Evidence Code section 761, that cross-examination is "the examination of a witness by a party other than the direct examiner upon a matter that is within the scope of the direct examination of the witness." He cites case law for the proposition that a defendant's waiver of the right to remain silent allows cross-

8

examination as to the testimony voluntarily given but does not extend to inquiry into collateral matters.  (E.g., *Johnson v. United States* (1943) 318 U.S. 189, 195 [87 L.Ed. 704].)  He cites case law finding no abuse of discretion and argues those cases are different from this case.

There was no improper cross-examination.  Defendant testified Brown was an eyewitness to Wilkerson's supposed story that he and his girlfriend had just broken up and he needed defendant's help to retrieve his own property from her house.  The defense listed Brown on its witness list and told the jury she would testify.  On direct examination defendant twice testified Brown was his "fiancée at the time."  Defendant thus set the stage for an impartial exculpatory witness.

The prosecutor was entitled on cross-examination to explore the relationship between defendant and Brown, to explore the implication that she was impartial.  Since defendant volunteered on direct examination that she was his fiancée "at the time," he opened the door to inquiry on the subject of their relationship and its continuing existence.  In light of the fact that defendant on direct examination asserted that the two were engaged to be married at the time of the pertinent conversation and based on defendant's inclusion of Brown on his witness list, and also considering the fact that the prosecutor would not be able to recall defendant on the subject once his testimony was concluded, it was fair game to ask if the two remained engaged at the time of trial. Strategically, the prosecutor was going to be able to capitalize on defendant's answer, whether it was "yes" or "no."  If defendant testified they were still engaged it would call into question the credibility of Brown if, as the parties anticipated, she testified in the defense case.  If defendant said that they were no longer engaged and attempted to distance himself from her (as he did) in order to bolster her testimony, the prosecutor then could present evidence to counter that argument by showing how often defendant and Brown had spoken since the date of defendant's arrest.  Once defendant lied about how often he had been in touch with Brown, the prosecutor was entitled to pin down those lies

9

in anticipation of the prosecution's evidence that the two had communicated often and recently, thus attacking defendant's credibility as a witness. And, clearly, the prosecutor did not raise a collateral matter merely for the purpose of contradicting it, because at that time everyone expected Brown to testify as a defense witness.

Nor does defendant show the trial court abused its discretion by permitting rebuttal evidence that he telephoned Brown from jail 25 to 30 times in the last two weeks. It was clearly probative as to defendant's credibility and did not consume much time, taking up only four pages of reporter's transcript.

We conclude defendant fails to show evidentiary error regarding defendant's contacts with Brown. Since there was no error, we need not address defendant's arguments about prejudice.

II

*Prior Convictions*

Defendant argues the trial court abused its discretion by allowing the jury to hear about his two prior burglary convictions, in violation of his Fourteenth Amendment right to due process and a fair trial. We see no reversible error.

The parties submitted cross-motions in limine on admissibility of evidence of defendant's dozen prior convictions -- ranging from a 1979 misdemeanor auto theft to a 2009 misdemeanor drug offense, burglary convictions in 1981 (second-degree), 1984 (first-degree with defendant serving as lookout), 2001 (first-degree), and 2003 (second-degree burglary) -- plus several parole violations. The prosecutor sought to use the prior record as crimes of moral turpitude impeaching defendant's credibility. The prosecution also sought to use the 1984 and 2001 residential burglary convictions to prove intent and absence of mistake under Evidence Code section 1101, subdivision (b), refuting defendant's testimony that he thought he was just helping someone retrieve his own

10

property from a girlfriend's house. Defendant argued the evidence was improper propensity evidence and some was remote.

On appeal, defendant cites the judge's evidentiary ruling from the first trial, which we disregard. The judge in the second trial at issue in this appeal ruled the three burglary convictions were crimes of moral turpitude presumptively admissible for impeachment. The court also ruled the jury could learn the prior convictions were for burglaries, because the highly probative value of the evidence under Evidence Code section 1101, subdivision (b), outweighed the potential for undue prejudice under Evidence Code section 352.

The court instructed the jury with CALCRIM No. 316: "If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

The court also instructed the jurors with CALCRIM No. 375, that if they found defendant committed the prior residential burglaries, "you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant entered a residence with the intent to commit theft. [¶] . . . [¶] Do not consider this evidence for any other purpose except for the limited purpose of deciding whether the defendant entered a residence with the intent to commit theft. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of first degree burglary. The People must still prove each charge beyond a reasonable doubt."

11

*Analysis*

The California Constitution provides that "[a]ny prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding. . . ." (Cal. Const., art. I, § 28, subd. (f)(4).) The use of prior convictions for impeachment remains subject to the trial court's discretion under Evidence Code section 352. (*People v. Clark* (2011) 52 Cal.4th 856, 931.) In exercising its discretion to admit prior convictions for impeachment, the trial court is guided by four factors: (1) Whether the prior conviction reflects on honesty and integrity; (2) whether it is near or remote in time; (3) whether it was incurred for the same or substantially similar conduct for which the witness-accused is on trial; and (4) what effect admission would have on the defendant's decision to testify. (*Ibid*., citing *People v. Beagle* (1972) 6 Cal.3d 441, 453.)

Defendant finds fault with respect to the second and third factors.

He argues the 1984 and 1999 residential burglary convictions were remote. However, remote convictions are not automatically inadmissible for impeachment purposes and are admissible when the defendant has not led a "legally blameless life" since the conviction. (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 926 [allowed impeachment with 18-year-old prior conviction].) Defendant's 1984 residential burglary was his *second* conviction for residential burglary, the first being in 1981. Among defendant's other convictions were misdemeanor auto theft in 1989; misdemeanor domestic violence in 1990; the 1999 residential burglary conviction; the 2003 commercial burglary; misdemeanor drug convictions in 2008 and 2009; and the instant offense in January 2010. Defendant's continuous life of crime justified use of the 1984 and 1999 convictions.

12

As to the third factor of similarity of crimes for impeachment purposes, defendant argues the similarity of the prior residential burglary convictions to this residential burglary prosecution prejudiced him, and the trial court should have sanitized the convictions or used his convictions for other offenses. However, the nature of the prior residential burglary convictions was separately admissible for the independent purposes of intent and absence of mistake.

Thus, Evidence Code section 1101, while generally restricting character evidence to prove conduct on a specified occasion, provides in subdivision (b): "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." A trial court's decision to admit evidence under Evidence Code section 352 is reviewed for abuse of discretion. (*People v. Mendoza* (2007) 42 Cal.4th 686, 699.)

Defendant, a grown man, tried to convince the jurors that a teenaged acquaintance duped him into participating in a residential burglary -- i.e., that defendant lacked intent to commit burglary and his involvement was a mistake. His prior residential burglary convictions had high probative value to disprove his story.

Defendant's only argument about Evidence Code section 1101 in his opening brief is that the prosecutor committed prejudicial misconduct by using the prior convictions as propensity evidence. We reject this claim, *post*.

Defendant contends admission of the evidence violated due process by making the trial fundamentally unfair. He claims "[t]here can be little doubt" the jury improperly used the prior convictions as propensity evidence, and the jury instructions forbidding such use "required mental gymnastics that no juror could reasonably perform." We disagree. Defendant cites *Shepard v. United States* (1933) 290 U.S. 96 [78 L.Ed. 196], which found the trial court prejudicially erred in allowing as a dying declaration the

13

murder victim's hearsay statement accusing the defendant of poisoning her. The statement did not qualify as a dying declaration, because it was made several weeks before death, at a time when the victim's health was improving. (*Id*. at p. 99.) The intermediate appellate court held the statement was admissible on other grounds -- to refute defense evidence that the victim was suicidal. (*Id* at p. 102.) The high court rejected that alternative theory because the evidence had not been offered or received for that narrow purpose at trial, and that theory would be unlikely to occur to the minds of jurors uninstructed on that narrow purpose. (*Id*. at pp. 102-103.) Defendant cites *Shepard* for its statement that the purported distinction between uses of the evidence was "a feat beyond the compass of ordinary minds" to limit the purpose of the evidence. (*Id*. at p. 104.)

*Shepard* affords defendant no help in his appeal, because here the evidence was offered and received for the specific narrow purpose, and the jury was instructed on that narrow purpose.

Defendant's reply brief quotes from respondent's brief -- which merely reiterated the prosecutor's point about the implausibility of the mature, experienced burglar being duped into a burglary by a teenager. Defendant's reply brief then cites several law review articles about scientific studies of mock juries. We disregard this new argument and authority raised for the first time in the reply brief. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.)

We conclude there was no evidentiary error.

### III

### *Claims of Prosecutorial Misconduct*

Defendant maintains the prosecutor committed prejudicial misconduct by questions and argument going to propensity and bad character. Assuming for the sake of

argument that none of these points were forfeited by failure to object, as asserted by the People, defendant fails to show grounds for reversal.

The prosecutor cross-examined defendant about the two prior residential burglaries. In one, he stayed outside as the lookout. In the other, he went into the house and took a television. The prosecutor asked: "How many times have you burglarized a residence? Not just got caught, but how many times have you done it?" The trial court sustained the defense's unspecified objection. The prosecutor argued it went to defendant's state of mind. The court ruled, "No. I'm not going to make him answer that question. He has a privilege not to incriminate himself if he has done anything like that. I don't know that he has, but he needn't answer that particular question."

The prosecutor next asked, "So you're telling this jury that you've [committed burglaries before] [b]ut in this case you basically got duped into committing a burglary by this guy you described as a young guy?" The trial court sustained an objection that the question was compound, overruled objections to reframed questions but asked defendant if he understood them until the prosecutor moved on after eliciting only defendant's claim he had no idea it was a burglary. The prosecutor later returned to the subject, asking if, "despite your experience with this very type of crime, nothing ever raised your suspicions about any of this on this day, until the police showed up[?]" Defendant said that was correct.

The prosecutor later probed defendant's testimony that he committed the prior burglaries when he was a "youngster" 19 or 20 years old, whereas he was now 51. Defendant testified, "back then I was younger than what I am now, and I was into that life, you know what I mean. Street life. And yes. And now by me being an older gentleman, no, I'm not prone to go out and do burglaries, you know what I mean." The prosecutor asked, "But you've been around for a long time in that life, right? You're saying it was a previous -- that it was when you were younger. That was a long stretch."

15

The trial court sustained the defense objection that this was "straight up propensity evidence."

In closing argument, the prosecutor told the jury defendant "just couldn't be more guilty of the crimes that he's charged of -- charged with." The defense did not object but did object on propensity grounds when the prosecutor said, "They were there for a purpose. They were going to get everything they could get, all the valuables they could get. . . . [¶] Mr. Wilkerson wasn't in there doing that himself. [Defendant], with his background, was in there doing it." Over defendant's propensity objection, the trial court ruled the argument fair, in light of the court's Evidence Code section 1101, subdivision (b), ruling.

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the *federal* Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under *state law*, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citations.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 965-966.)

Defendant claims the prosecutor's question about uncharged burglaries suggested the prosecutor had knowledge there were some, and the court's comment did not disabuse the jury of this possibility. And he claims he was prejudiced by the prosecution's reference to his long stretch of criminality. We disagree. The trial court sustained defense objections and instructed the jury to ignore any question to which the court sustained an objection. We presume the jurors followed the instruction. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

As to the prosecutor's closing arguments, the prosecutor did not argue that defendant "couldn't be more guilty" based on his prior criminal history, as defendant asserts on appeal. The prosecutor's latter remark that Wilkerson was not acting alone and

16

defendant "with his background, was in there doing it" was permissible argument that defendant was lying when he claimed he had no idea he was aiding a burglary. Moreover, the prosecutor made clear he was not urging the jury to find defendant guilty based on propensity. The prosecutor reminded the jury of the special instruction about the prior convictions and said: "I can't emphasize enough that it isn't like, um, you know, a residential burglary happened in his neighborhood, so he probably did it. It's not that. It's given all the circumstances, the law recognizes that when he's up here claiming that I didn't know a burglary was happening, that it's so important to consider that he's done two burglaries before. [¶] When you're assessing his credibility in deciding whether he really believed that he had a right to be over there, his prior burglary convictions are really important to consider. Because not only has he -- is he caught red-handed at the scene, when he says, 'Oh, I didn't know this was a burglary,' well, this isn't -- you're not some young naïve guy. I mean, you've been convicted of multiple residential burglaries before. [¶] So it goes to show that that story -- and I'm going to get into details of the story and how it's obvious that it's completely bogus in its own right. But his background even shows that that's not believable. Okay. [¶] So the defendant's testimony. He says that he went to [the victim's] house with a virtual stranger to help take property, but he didn't ask any questions, he didn't have any idea what he was going to take, or where he was going to take it. He didn't know this guy hardly, Demetrius Wilkerson. He didn't know where he was going. He didn't know why he was going. He didn't know where he was going to take anything. All these things, again, considering his background. Okay. He is not a naïve kid. He knows. All right. [¶] He says he took property, but he never entered the house. He even goes so far as to say he never crossed the plane of the sliding glass door. And all that is, is just the defendant knowing -- he knows what residential burglary is about. He knows the law of residential burglary. You know, he's been convicted of it twice. [¶] He -- and he -- you know, I don't know if you guys all remember or not, yesterday when he said that

17

Demetrius Wilkerson reached out outside the plane of the sliding glass door, it's pretty unusual language. Well, it's straight from the jury instruction that you just heard saying that you have to enter the residence, and just going inside, reaching in past a window screen is entering a residence. So he was real careful to say he didn't break the plane of the house. Okay? [¶] It's just -- he's a hustler."

The prosecutor's arguments were fair comment on the evidence to prove intent and disprove defendant's claim of mistake. (*People v. Stevens* (2007) 41 Cal.4th 182, 209-210 [prosecutor made fair comment by arguing to the jury that the defendant failed to present testimony of an obvious witness to rebut the prosecution's case or corroborate the defense case].) And, as indicated, the jury was properly instructed that the prior burglary convictions could be considered only in evaluating credibility, "for the limited purpose of deciding whether or not the defendant entered a residence, as charged here, with the intent to commit theft."

There was no prejudicial prosecutorial misconduct.

Having reviewed all of defendant's claims, we reject his contention that the cumulative effect of the claimed errors prejudiced him.

DISPOSITION

The judgment is affirmed.

_____HULL_____, J.

We concur:

_____RAYE_____, P. J.

_____BLEASE_____, J.

19